George P. Angelich
David Wynn
Eric Roman
George V. Utlik
ARENT FOX LLP
1675 Broadway
New York, NY 10019
(212) 484-3900

*Counsel for the Official Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| VIVARO CORPORATION, *et al.*, | : | Case No. 12-13810 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

---------------------------------------------------------- x

| | | |
|---|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF VIVARO CORPORATION, *et al.*, | : | |
| | : | |
| Plaintiff. | : | |
| | : | |
| v. | : | |
| | : | Adversary Proceeding No. 14- |
| LEUCADIA NATIONAL CORPORATION, BALDWIN ENTERPRISES, INC., BEI PREPAID, LLC, BEI PREPAID HOLDINGS, LLC, PHLCORP, INC., IAN CUMMINGS, JOSEPH STEINBERG, DAVID LARSEN, JIM CONTINENZA, ST FINANCE LLC, SAMER TAWFIK, AND DOES 1 - 12, | : | |
| | : | |
| Defendants. | : | |

----------------------------------------------------------x

## <u>COMPLAINT</u>

The Official Committee of Unsecured Creditors of the above-captioned debtors and debtors in possession, Vivaro Corporation; STi Prepaid, LLC; Kare Distribution, Inc.; STi Telecom, Inc.; TNW Corporation; STi CC 1, LLC; and STi CC 2, LLC (collectively, the "Debtors"), by and through its counsel, Arent Fox LLP ("Arent Fox"), for its complaint (the "Complaint"), states as follows:

## NATURE OF THE ACTION

1.     This action seeks redress for the wrongful conduct of Defendants in which they sought to benefit themselves in their operation of STi Prepaid, LLC ("STi"), which also entailed breach of their fiduciary obligations as members of STi, and specifically seeks to avoid and recover various transfers that were made either directly or indirectly to Leucadia National Corporation ("Leucadia"), Baldwin Enterprises, Inc. ("Baldwin") and/or one or more of the other defendants (collectively, "Defendants") by STi and Vivaro Corporation ("Vivaro") after both STi and Vivaro, on information and belief, were insolvent.  These transfers fall generally into two categories.  The first set of transfers was from STi to Baldwin in 2007 – 2008 when, on information and belief, STi was already insolvent.  Specifically, there were four transfers totaling approximately $37 million: (a) $15 million in June 2007; (b) $12 million in November 2007; (c) $5 million in July 2008; and (d) $5 million in December 2008.  On information and belief, STi was insolvent when these transfers were made.

2.     The second set of transfers totaling approximately $13 million involved: (1) the transfer of $600,000 in cash by Vivaro (the "Cash Payment") and the incurrence of obligations in the form of a $19.4 million note (the "Note") in favor of Baldwin by Vivaro in connection with Vivaro's purchase of  membership interests of STi (the "Acquisition"); (2) the incurrence of obligations in the form of a guaranty of the Note by STi (the "Guaranty") in connection with the

Acquisition; and (3) the subsequent payments totaling approximately $12.4 million (collectively, the "Note Payments" and each a "Note Payment") by STi and/or Vivaro to Baldwin on account of the Note.

3.     Following their wrongful conduct and breach of duty, at the time of the Acquisition, STi was insolvent and Vivaro was either insolvent or was rendered insolvent by the Cash Payment and the Note.  Both Vivaro and STi were similarly insolvent when they made each of the Note Payments and each Note Payment only served to deepen their insolvency.

4.     Vivaro, which purchased the membership interests of STi, an insolvent company, did not receive either reasonably equivalent value or fair consideration in exchange for the Cash Payment, the Note, or the Note Payments.  STi, whose membership interests were transferred pursuant to the Acquisition, did not receive reasonably equivalent value or fair consideration in exchange for the Guaranty or the Note Payments and was left with unreasonably small capital.

5.     The Committee therefore brings this action to avoid and recover from the Defendants, as fraudulent conveyances, (i) the STi Transfers (defined below); and (ii) the Cash Payment, the Note, the Guaranty, and the Note Payments, pursuant to Sections 544, 548, 550 and 551 of title 11 of the United States Code (the "Bankruptcy Code") and Sections § 270, *et seq.* of the New York Debtor and Creditor Law (the "DCL").

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 because the claims asserted in this adversary proceeding arise in the above-referenced Chapter 11 bankruptcy cases.

7.     This proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(A).

8.     Venue is proper in this Court by reason of 28 U.S.C. §§ 1408 and 1409, and because the Debtors' bankruptcies have been jointly administered in this Court.

9.     Pursuant to Rule 7008-1 of the Local Bankruptcy Rules for the Southern District of New York, the Plaintiff consents to the entry of final orders or judgments by this Court in this adversary proceeding.

## PARTIES

10.     Plaintiff is the Official Committee of Unsecured Creditors (the "Committee") of the Debtors appointed by the Office of the United States Trustee for Southern District of New York in the above-referenced bankruptcy proceedings on October 3, 2012 under Section 1102 of the Bankruptcy Code.

11.     Defendant Leucadia is a corporation organized under the laws of the State of New York, with its principle place of business located at 315 Park Avenue South, 20th Floor, New York, NY 10010.

12.     Defendant Baldwin is a corporation organized under the laws of the state of Colorado.  At all times relevant to this action, Baldwin was a wholly-owned subsidiary of Leucadia.

13.     Defendant BEI Prepaid, LLC ("BEI") is a limited liability company organized under the laws of the State of Delaware, and at all times relevant to this Complaint was the 75% majority member of STi and a 90% owned subsidiary of BEI Prepaid Holdings, LLC.

14.     Defendant BEI Prepaid Holdings, LLC ("BEI Holdings") is a limited liability company organized under the laws of the State of Delaware, and at all times relevant to this Complaint was a 90% owned subsidiary of Baldwin and 90% member of BEI.

15.     Defendant Phlcorp, Inc. ("Phlcorp") is corporation organized under the laws of the State of Pennsylvania, and at all times relevant to this Complaint was a wholly-owned subsidiary of Leucadia and the parent of Baldwin.

16.     Defendant Ian Cummings ("Cummings") is an individual and, on information and belief, has at all times relevant to this Complaint been a 13% shareholder of Leucadia.

17.     Defendant Joseph Steinberg ("Steinberg") is an individual and, on information and belief, has at all times relevant to this Complaint been a 13% shareholder of Leucadia.

18.     Defendant David Larsen ("Larsen") is an individual and, on information and belief, has at all times relevant to this Complaint held a 10% non-voting membership interest in BEI and was a manager of STi.

19.     Defendant Jim Continenza ("Continenza") is an individual and, on information and belief, at all times relevant to this Complaint, he was the president and a manager of STi.

20.     Defendant ST Finance LLC ("ST Finance") was a limited liability company organized under the laws of Delaware that, on information and belief, owned a 25% interest in STi at all times relevant to the STi Transfers (defined below).

21.     Defendant Samer Tawfik is an individual and, on information and belief, was at all times relevant to the STi Transfers (defined below) the 100% owner of ST Finance.

22.     Does 1 through 12 (collectively, the "Doe Defendants"), are natural persons or business entities whose identities are presently unknown to Plaintiff, each of whom:

        (a)     may be a necessary or proper party to this action; and

        (b)     is either (i) a natural person who resides in or is domiciled in this State, (ii) a juridical entity that is incorporated, organized, established, headquartered, or licensed to conduct business within this State, or (iii) a natural person or juridical

entity that, upon information or belief, in person or through a partner, member, trustee, agent, or affiliate, (A) regularly transacts or solicits business in this State, (B) derives substantial revenue from goods used or services rendered in this State, (C) derives substantial revenue from interstate or international commerce, or (D) maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

## **PROCEDURAL HISTORY**

23.     On September 5, 2012 (the "Petition Date"), the Debtors filed a voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Court").  The Debtors continue to operate their businesses as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

24.     At all relevant times, the Debtors produced, marketed and sold pre-paid international calling cards for consumer end-users primarily in the Hispanic community.

25.     On October 3, 2012, the Office of the United States Trustee for the Southern District of New York appointed five members to the Committee, pursuant to Sections 1102(a) and 1102(b) of the Bankruptcy Code.

26.     On October 4, 2012, at a meeting during which all of the Committee members participated, the Committee selected and formally voted to retain Arent Fox as its counsel.  The Court approved Arent Fox's retention application, effective *nunc pro tunc* to October 4, 2012, by order dated November 26, 2012 [ECF No. 127].

27.     By Order dated January 31, 2013 [ECF No. 288], the Court approved the sale of substantially all of the Debtors' assets to Next Angel, LLC, n/k/a Angel Americas, LLC. The sale closed on February 8, 2013.

28.     By Stipulation and Order dated August 25, 2014 [ECF No. 552], the Court granted standing and authority to the Committee to commence and prosecute this action.

### FACTUAL ALLEGATIONS

**A.      Leucadia Purchased a 75% Majority Interest in STi In March 2007**

29.     Leucadia is a publicly traded holding company that, through its subsidiaries, engages in a number of different industries, including mining, healthcare, manufacturing, banking, real estate, winery, and telecommunications.

30.     In January 2007, Leucadia entered into an agreement with Telco Group, Inc. ("Telco") to expand its telecommunications holdings by purchasing Telco's prepaid calling card business. At the time, Telco was owned 100% by Samer Tawfik.

31.     At that time, Telco, which on information and belief operated under the brand name STi Prepaid and variations thereof, was a provider of international prepaid phone cards, prepaid wireless and other telecommunications services in the United States.

32.     In March 2007, STi, an indirect, 75%-owned subsidiary of Leucadia, purchased a 75% interest in Telco for approximately $121.8 million.

33.     Pursuant to the transaction, the remaining 25% ownership interest in STI was owned by ST Finance.

34.     STi had only two members:  (i) BEI Prepaid, LLC ("BEI"), an indirect, 90% owned subsidiary of Leucadia that held 75% of the shares in STi, and (ii) ST Finance, which owned the remaining 25%.

35.     In short, as of March 2007, Leucadia was the 75% indirect owner of now-debtor STi and remained so until October 2010, when Leucadia sold the company to debtor Vivaro.

**B.     STi's Position within the Leucadia Corporate Structure**

36.     On information and belief, Figure 1, below, illustrates STi's position within the corporate structure of Leucadia during the time period relevant to this Complaint.



**Figure 1**

37.     Referring to organizational chart in Figure 1, while Leucadia and Baldwin were, on the face of the chart, some layers removed from BEI (STi's majority member), on information and belief, it was Baldwin that was the initial recipient of any monetary transfers that STi paid to its members.

38.     Referring again to Figure 1, on information and belief, Defendants BEI Holdings and Phlcorp, as indirect parents of STi, and Defendants Cumming, Steinberg and Larsen, as owners of stock in Leucadia (Cumming and Steinberg) and BEI (Larsen) also received all or part

of any upstream monetary transfer from STi. On information and belief, Defendant Continenza also received a portion of any upstream monetary transfer from STi.

39.     On information and belief, as STi's 25% member, ST Finance, and ST Finance's 100% owner, Defendant Tawfik, also received transfers from STi, or a share of STi's transfers to Baldwin, during the time period relevant to this Complaint.

40.     Thus, to the extent that Defendants Leucadia, BEI Holdings, BEI, Phlcorp, Cumming, Steinberg, Larsen, Continenza, ST Finance, and/or Tawfik were transferees of funds from STi during the time period relevant to this Complaint, those transfers are avoidable and recoverable as fraudulent transfers.

## C.     STi's Financial Condition at the Time of the Relevant Transfers

41.     Examination of the books and records of STi under Leucadia's ownership, which lasted from March 2007 through October 2010, shows a company in financial decline.

42.     In June 2007, STi had total assets of approximately $142.6 million and approximately $106.2 million in total liabilities, with a total equity per STi's books and records of approximately $36.4 million.

43.     However, the total equity calculation for June 2007 appears to include phantom assets. In June 2007, STi recorded total equity of approximately $36.4 million. But, within the next quarter, adjustments were made to these assets that caused liabilities to be in excess of adjusted assets resulting in a deficit. The sudden disappearance of these assets from STi's books and records indicates that those accounts were either overstated or incorrect as of June 2007.

44.     As such, STi was, on information and belief, insolvent as of June 2007.

45.     In any event, five months later, by November 2007, STi's books and records confirm that it was insolvent. For example, as of November 2007, STi had total assets of

approximately $83.0 million and total liabilities of approximately $100.3 million, for a total negative equity of approximately $12.8 million.

46.     After November 2007, STi's insolvency only deepened.

47.     By July 2008, STi's negative equity increased to a deficit of $13.9 million, and by December 2008 had increased even further to a deficit of $16.8 million.

48.     Notwithstanding STi's insolvency, it made repeated transfers directly to Baldwin.

49.     On June 5, 2007, STi transferred $15.0 million via a Fedwire debit to "Baldwin Enterprises," which on information and belief refers to Baldwin.

50.     On November 5, 2007 (when, as explained above, STi was insolvent), STi transferred an additional $12.0 million to Baldwin.

51.     In addition, on July 22, 2008, (by which time, as explained above, STi had sunk even deeper into insolvency), STi transferred an additional $5.0 million to Baldwin.

52.     Finally, on December 31, 2008, STi (at a point by which its insolvency had deepened even further) transferred yet another $5 million via a book transfer debit directly to "Baldwin Enterprises Inc Salt Lake City UT."

53.     In sum, in 2007 and 2008, there were four known transfers of money made from STi to Baldwin while STi was, on information and belief, insolvent: one for $15 million in June 2007, a second for $12 million in November 2007, a third for $5 million in July 2008, and a fourth for $5 million in December 2008 (the "STi Transfers").

54.     As was previously explained, on information and belief, Defendants BEI Holdings and Phlcorp, as indirect parents of STi, and Defendants Cumming, Steinberg and Larsen, as owners of stock in Leucadia (Cumming and Steinberg) and BEI (Larsen) also received

all or part of the STi Transfers.  On information and belief, Defendant Continenza also received a portion of any upstream monetary transfer from STi.

55.     On information and belief, STi's 25% member, ST Finance, as well as ST Finance's 100% owner, Defendant Tawfik, also received one or more transfers from STi, or a share of STi's transfers to Baldwin, during the time period relevant to this Complaint.

56.     Thus, to the extent that Defendants Leucadia, BEI Holdings, BEI, Phlcorp, Cumming, Steinberg, Larsen, Continenza, ST Finance and/or Tawfik were transferees of funds from STi during the time period relevant to this Complaint, those transfers are avoidable and recoverable as fraudulent transfers.

**D.     The STi Transfers on their Face Cannot Be Member Distributions**

57.     Article I of the Limited Liability Company Agreement for STi defines distributions to members as follows:

> Distributions means distributions of money or other property made by the Company with respect to Units or other securities (if any) of the Company. All Distributions shall be made with respect to each Unit of a particular class equally unless otherwise provided in this Agreement or agreed upon by all of the Members of such class. Distributions shall not include the payment of money or other property to holders of Units or other securities of the Company for reasons or in any capacity other than their ownership of such Units or securities.

58.     The STi Transfers were, on information and belief, transfers of money directly from STi to Baldwin.

59.     Baldwin, however, was not a member of STi.  Rather, it was BEI, not Baldwin, that was a member of STi.

60.     None of the STi Transfers are either a dividend payment, a return of capital, or any other transfer made "with respect to Units or other securities" of STi, and therefore the STi

transfers were not distributions to its members in accordance with STi's Limited Liability Company Agreement.

61. Said STi Transfers were not only avoidable and recoverable but also, upon information and belief, constituted an ongoing and continuing disregard of Defendants' fiduciary obligations to STi and STi's stakeholders, including STi's creditors, in connection with their ownership, control, management, and operation of STi.

**E.     Vivaro's Purchase of STi from Baldwin in October 2010**

62. On October 14, 2010, the Acquisition occurred whereby Vivaro acquired STi from Baldwin for a purchase price of $20 million.

63. To consummate the Acquisition, Vivaro made an initial Cash Payment to Baldwin in the amount of $600,000 and Baldwin took the Note from Vivaro which was in the amount of $19.4 million.  The Note was guaranteed by STi.

64. According to the estates' books and records, both on a standalone entity and on a consolidated basis, Vivaro and STi were both insolvent at the time of the Acquisition and thereafter.

65. Vivaro was unable to make timely payments on the Note under the original repayment schedule.

66. In fact, Vivaro experienced difficulties making those periodic payments within just a few months of the closing on the Acquisition.

67. As a result, Baldwin and Vivaro continuously amended the repayment schedule throughout the course of the Note.

68. For example, in March 2011 through May 2011, Baldwin agreed to accept just $100,000 a month, with the payments to increase back to the $600,000 level in June 2011, as was contemplated under the original repayment schedule.

69.     Still, even with these amendments, by late 2011, Vivaro and STi (the operating entity that was actually funding the Note payments) continued to experience serious liquidity issues and were falling behind on their payments to Baldwin.

70.     The payments made to Baldwin under the Note exacerbated even further the poor financial condition and deepening insolvency of both STi and Vivaro.

71.     On information and belief, to satisfy the obligations under the Note, as amended, in December 2011, STi entered into an agreement with The Receivables Exchange ("TRE") to monetize its accounts receivables from about ten (10) customers by auctioning them at a rate of 85% of their face value.

72.     Under the terms of the TRE agreement, TRE was to receive pools of receivables to be sold or financed by multiple lenders as needed on a daily basis.

73.     TRE would maintain control of a lockbox account into which STi's customers would deposit remittances.

74.     Any collections that were received would first pay back the lenders, and then — after withholding applicable fees and interest — the balance would be remitted to STi.

75.      In December, 2011, STi caused TRE to pay directly to Baldwin the sum of $7 million from the proceeds of the factored receivables that would otherwise be due to STi. Prior to the factoring transaction, Baldwin had agreed to accept the sum of $7 million in full and final satisfaction of the Note.

76.     Thus, in repayment of the Note and in addition to the Cash Payment, Baldwin received from Vivaro and/or STi, multiple payments totaling approximately $12.4 million.

77.    All of the approximately $12.4 million of payments that Baldwin received from Vivaro and/or STi in repayment of the Note were made while, on a standalone entity basis and on consolidated basis, Vivaro and STi were insolvent.

**F.    The Payments Made by Vivaro and/or STi in Satisfaction of the Note**

78.    Figure 2, below, shows both the original schedule of payments due from Vivaro on the initial down payment for the purchase of STi and on the Note.  Figure 2 also shows the amounts that Vivaro and/or STi actually paid to Baldwin of the originally agreed on $20 million purchase price.

| ($ in 000's) | Original Schedule | Amended Schedule | Actual Payments |
|---|---|---|---|
| Oct-10 | $    600 | $    600 | $    600 |
| Nov-10 | 400 | 400 | 400 |
| Dec-10 | 400 | 400 | 575 |
| Jan-11 | 400 | 400 | 225 |
| Feb-11 | 400 | 400 | 400 |
| Mar-11 | 400 | 100 | 100 |
| Apr-11 | 600 | 100 | 100 |
| May-11 | 600 | 100 | 100 |
| Jun-11 | 600 | 600 | 600 |
| Jul-11 | 600 | 600 | 600 |
| Aug-11 | 600 | 600 | 600 |
| Sep-11 | 600 | 600 | 450 |
| Oct-11 | 800 | 800 | 200 |
| Nov-11 | 800 | 800 | 500 |
| Dec-11 | 800 | 800 | 6,954 |
| Jan-12 | 800 | 800 | - |
| Feb-12 | 800 | 800 | - |
| Mar-12 | 800 | 800 | - |
| Apr-12 | 1,000 | 1,000 | - |
| May-12 | 1,000 | 1,000 | - |
| Jun-12 | 1,000 | 1,000 | - |
| Jul-12 | 1,000 | 1,000 | - |
| Aug-12 | 1,000 | 1,000 | - |
| Sep-12 | 1,000 | 5,300 | - |
| Oct-12 | 1,000 | - | - |
| Nov-12 | 1,000 | - | - |
| Dec-12 | 1,000 | - | - |
| Total | $  20,000 | $    20,000 | $  12,404 |

**Figure 2**

79.    Referring to Figure 2, Vivaro's original schedule of payment in exchange for the purchase of STi was for $20 million broken down into 27 payments, including the initial down

payment of $600,000. Of the $20 million, Vivaro and/or STi actually paid approximately

$13 million, which is the amount that the Committee seeks to recover from the Defendants as

fraudulent transfers.

## CLAIM ONE
### (Avoidance of the STi Transfers as Fraudulent Conveyances under 11 U.S.C. § 544 and DCL §§ 273 and 274)

80.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing

paragraphs as though fully set forth herein.

81.     At all times relevant to the above-described STi Transfers, there have been and

are one or more creditors who have held and still hold matured or unmatured unsecured claims

against STi that were and are allowable under Section 502 of the Bankruptcy Code or that were

and are not allowable only under Section 502(e) of the Bankruptcy Code.

82.     Each of the STi Transfers constituted a conveyance by STi as defined under DCL

Section 270.

83.     Each of the STi Transfers was made within six years prior to the Petition Date.

84.     STi did not receive fair consideration or value in exchange for any of the

STi Transfers.

85.     STi was insolvent at the time of, or became insolvent as a result of, the

STi Transfers.

86.     STi was left with unreasonably small capital because of the STi Transfers.

87.     As a result of the foregoing, the STi Transfers should be avoided pursuant to

Sections 544 of the Bankruptcy Code and DCL §§ 273 and 274.

## CLAIM TWO
### (Avoidance of Vivaro's Note Obligation as a Fraudulent Obligation Under 11 U.S.C. §§ 544 and 548(a)(1)(B) and DCL §§ 273, 274 and 275)

88.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

89.     In October 2010, in connection with Vivaro's Acquisition of STi, Baldwin took the Note from Vivaro, pursuant to which Vivaro was obligated to pay Baldwin $19.4 million.

90.     STi was insolvent at the time of the Acquisition, and therefore Vivaro did not receive reasonably equivalent value or fair consideration in exchange for incurring the Note obligation.

91.     The Note was issued within two years of the Petition Date.

92.     Vivaro was insolvent at the time of, or became insolvent as a result of, the obligations it incurred under the Note and because of the Note Payments.

93.     In addition, by taking on the payment obligations under the Note, Vivaro (i) was engaged in business, or about to engage in business, for which Vivaro was left with unreasonably small capital, and/or (ii) intended to incur, or believed that it would incur, debt that would be beyond its ability to pay as such debts matured.

94.     Accordingly, the Note was an obligation that Vivaro took in fraud of the rights of the creditors of Vivaro and STi, and its obligation under the Note should be avoided pursuant to Sections 544 and 548(a)(1)(B) of the Bankruptcy Code and DCL §§ 273, 274 and 275.

## CLAIM THREE
### (Avoidance of STi's Guaranty Obligation as a Fraudulent Obligation Under 11 U.S.C. §§ 544 and 548(a)(1)(B) and DCL §§ 273, 274 and 275)

95.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

96.     In October 2010, in connection with Vivaro's Acquisition of STi, Baldwin took the Note from Vivaro, pursuant to which Vivaro was obligated to pay Baldwin $19.4 million.

97.     The Note was guaranteed by STi.

98.     STi did not receive reasonably equivalent value or fair consideration in exchange for STi's obligation under the Guaranty because the Acquisition merely involved the transfer of STi's membership interests from one corporate parent to another corporate parent.

99.     STi's Guaranty was executed within two years of the Petition Date.

100.    STi was insolvent when, or became insolvent as a result of, the Guaranty.

101.    In addition, by incurring of the obligation under the Guaranty, STi (i) was engaged in business, or about to engage in business, for which STi was left with unreasonably small capital, and/or (ii) intended to incur, or believed that it would incur, debt that would be beyond its ability to pay as such debts matured.

102.    Accordingly, the incurrence of STi's obligation under the Guaranty was a transfer and obligation incurred in fraud of the rights of the creditors of STi, and the obligation incurred under the Guaranty should be avoided pursuant to Sections 544 and 548(a)(1)(B) of the Bankruptcy Code and DCL §§ 273, 274 and 275.

### CLAIM FOUR
**(Avoidance of the Cash Payment and the Note Payments as Fraudulent Transfers under 11 U.S.C. §§ 544 and 548(a)(1)(B) and DCL §§ 273, 274 and 275)**

103.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

104.    In connection with the Acquisition, Vivaro made a Cash Payment to Baldwin, among others, of $600,000.

105.    In connection with the Note and the Guaranty, Vivaro and STi made the additional Note Payments to Baldwin, among others, which are described and identified above.

106.     The Cash Payment and the Note Payments were transferred to Baldwin, among others, within two years of the Petition Date.

107.     Vivaro and STi were insolvent at the time of, or became insolvent as a result of, the Cash Payment and each of the Note Payments.

108.     Neither Vivaro nor STi received reasonably equivalent value or fair consideration in exchange for the Cash Payment or any of the Note Payments.

109.     In addition, by making the Cash Payment and the Note Payments, both Vivaro and STi (i) were engaged in business, or about to engage in business, for which Vivaro and STi were each left with unreasonably small capital, and/or (ii) intended to incur, or believed that they would incur, debt that would be beyond their ability to pay as such debts matured.

110.     Accordingly, the Cash Payment and the Note Payments were transfers in fraud of the rights of the creditors of Vivaro and STi, and therefore the Cash Payment and the Note Payments should be avoided pursuant to Sections 544 and 548(a)(1)(B) of the Bankruptcy Code and DCL §§ 273, 274 and 275.

## CLAIM FIVE
### (Recovery of Property under 11 U.S.C. §§ 550 and 551 and DCL §§ 278 and 279)

111.     Plaintiff hereby repeats and re-alleges each of the allegations set forth above as though fully set forth herein.

112.     As alleged above, Plaintiff is entitled to avoid the STi Transfers to Baldwin pursuant to Section 544 of the Bankruptcy Code and DCL §§ 273 and 274.

113.     As further alleged above, Plaintiff is entitled to avoid Vivaro's obligations under the Note and STi's obligations under the Guaranty pursuant to Sections 544 and 548(a)(1)(B) of the Bankruptcy Code and DCL §§ 273, 274 and 275.

114.    As further alleged above, Plaintiff is entitled to avoid the Cash Payment and the Note Payments made to Baldwin pursuant to Sections 544 and 548(a)(1)(B) of the Bankruptcy Code and DCL §§ 273, 274 and 275.

115.    The Defendants are each the initial, immediate or mediate transferees of the STi Transfers, the Cash Payment and the Note Payments.

116.    Pursuant to Sections 550 and 551 and DCL §§ 278 and 279, Plaintiff is therefore entitled to a judgment against Defendants avoiding, preserving and recovering the proceeds or value of the STi Transfers, the Cash Payment, and each of the Note Payments from Defendants.

**CLAIM SIX**
**(Avoidance and Recovery of the STi Transfers As Actual Fraudulent Transfers under 11 U.S.C. §§ 544, 548(a)(1)(A), 550 and 551 and DCL §§ 276, 276-a, 278 and 279)**

117.    Plaintiff hereby repeats and re-alleges each of the allegations set forth above as though fully set forth herein.

118.    Each of the STi Transfers constituted a conveyance by STi as defined under DCL Section 270.

119.    Each of the STi Transfers was made within six years prior to the Petition Date.

120.    Defendants Leucadia and Baldwin, among others, had actual knowledge that STi was insolvent in or about June 2007 and thereafter.

121.    Baldwin and Leucadia knew that STi's insolvency was deepening, as discussed above.

122.    Notwithstanding the foregoing, in 2007 to 2008, Baldwin and Leucadia, among others, caused STi to make the STi Transfers.

123.    As alleged above, Defendants received benefit from the STi Transfers.

124. At the time of the STi Transfers, Defendants Baldwin and Leucadia, among others, not only knew of STi's insolvency but also there was no legitimate purpose for the STi Transfers other than to benefit Defendants.

125. Defendants Baldwin and Leucadia, among others, also knew that the STi Transfers left STi unable to fulfill its obligations to its creditors and made the STi Transfers with the actual intent to hinder, delay, or defraud creditors.

126. The STi Transfers were made in violation of Sections 544 and 548(a)(1)(A) and DCL §§ 276 and 276-a.

127. Accordingly, pursuant to Sections 544, 548(a)(1)(A), 550 and 551 of the Bankruptcy Code and DCL §§ 276, 276-a, 278 and 279, Plaintiff is entitled to a judgment against Defendants avoiding, preserving and recovering the proceeds or value of the STi Transfers from Defendants plus legal fees.

## RESERVATION OF RIGHTS

128. The Plaintiff reserves the right, to the extent permitted under the Bankruptcy Code, Bankruptcy Rules, or by agreement, to amend this Complaint to include further information regarding the transfers at issue, including the breaches of fiduciary duty and STi Transfers, Cash Payment, and Note Payments, and any additional transfers, and assert any additional claims or causes of action, including, but not limited to, Sections 542, 544, 548, 550 and 551 of the Bankruptcy Code and applicable state law, relating to the subject matter of this action or otherwise relating to the Debtors and their estates against any Defendant or any third party.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court issue an order:

a) avoiding and recovering the STi Transfers;

b) avoiding and recovering the Cash Payment;

c) avoiding and setting aside the obligations incurred by Vivaro in connection with the Note;

d) avoiding and setting aside the obligations incurred by STi in connection with the Guaranty;

e) avoiding and recovering each of the Note Payments;

f) directing Defendants and any other initial transferee or entity for whose benefit such transfer was made, or as further provided in §§ 550 and 551 of the Bankruptcy Code and DCL §§ 278 and 279, any immediate or mediate transferee of the STi Transfers to pay to Plaintiff the amount of $37 million plus pre-judgment interest to the Plaintiff at the maximum legal rate running from the date of each of the avoidable transfers to the date of judgment herein;

g) providing that each Defendant to be jointly and severally liable for the entire amount of such STi Transfers, plus pre-judgment interest to the Plaintiff at the maximum legal rate running from the date of each of the avoidable transfers to the date of judgment herein;

h) directing Defendants and any other initial transferee or entity for whose benefit the Cash Payment or any Note Payment was made, or as further provided in §§ 550 and 551 of the Bankruptcy Code and DCL §§ 278 and 279, any immediate or mediate transferee of the Cash Payment and/or Note Payments to pay to Plaintiff the amount of $13 million plus pre-judgment interest to the Plaintiff at the

maximum legal rate running from the date of each of the avoidable transfers to the date of judgment herein;

i) providing that each Defendant to be jointly and severally liable for the entire amount of such Cash Payment and Note Payment, plus interest from the date of the Cash Payment and each of the Note Payments;

j) providing damages on account of conduct by Defendants who owned, controlled and managed STi by virtue of their acts of malfeasance or omission for breach of fiduciary duty, or aiding and abetting such breaches;

k) awarding pre-judgment interest to the Plaintiff at the maximum legal rate running from the date of each of the avoidable transfers to the date of judgment herein;

l) awarding post-judgment interest to the Plaintiff at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full, plus costs;

m) awarding to the Plaintiff the costs of suit incurred herein;

n) awarding to the Plaintiff legal fees under DCL § 276-a and statutory and punitive damages to the extent permitted by law;

o) requiring the Defendants to pay the amount of the judgment to Plaintiff; and

p) granting such other relief as the Court deems appropriate.

Dated:   New York, NY  
            September 4, 2014

ARENT FOX LLP

By:    */s/ George P. Angelich*  
        George P. Angelich  
        David Wynn  
        Eric Roman  
        George V. Utlik  
        1675 Broadway  
        New York, NY 10019  
        (212) 484-3900

*Counsel for the Official Committee*  
*of Unsecured Creditors*