# Arent Fox

Arent Fox LLP / Attorneys at Law
Los Angeles, CA / New York, NY / San Francisco, CA / Washington, DC
www.arentfox.com

June 22, 2015

**George P. Angelich**
Partner
212.457.5423 DIRECT
212.484.3990 FAX
george.angelich@arentfox.com

**VIA ELECTRONIC CASE FILING**

Honorable Martin Glenn
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

Re: *Status Report Regarding 9019 Motion and Objection*
  -------------------------------------------------------------------
  Official Committee of Unsecured Creditors of Vivaro Corp. v.
  <u>Leucadia National Corporation, *et al*., Adv. Pro. No. 14-02213 (MG)</u>

Dear Judge Glenn:

  Arent Fox LLP represents the Official Committee of Unsecured Creditors of Vivaro Corporation, *et al.* (the "<u>Committee</u>") and submits this status report, as requested by the Court at the conference held on May 5, 2015 (the "<u>May 5 Status Conference</u>")[1].  As of today, the parties have not reached agreement on any disputed issues and therefore the Committee requests that the Court schedule a final hearing on approval of the 9019 Motion.

  The May 5 Status Conference was held to address the (i) *Joint Motion of the Official Committee of Unsecured Creditors and the Debtors for an Order Approving the Settlement Agreement with Represented Defendants under Rule 9019 of the Federal Rules of Bankruptcy Procedure*, [ECF No. 709] (the "<u>9019 Motion</u>") and (ii) *Objection to Motion of the Official Committee of Unsecured Creditors and the Debtors for Entry of an Order Approving the Settlement Agreement with Leucadia National Corporation and Related Parties* [ECF No. 723] (the "<u>Insiders' 9019 Objection</u>").

  During the May 5 Status Conference, counsel for the Committee, the Debtors' and Insiders committed to continue global settlement discussions in an effort to resolve three (3) areas of disputes (a) the Insiders' 9019 Objection; (b) the estates' claims for recovery of certain avoidable transfers to insiders (the "<u>Chapter 5 Claims</u>"); (c) the estates' claims for damages related to breaches of fiduciary duties by the Debtors' directors and officers ("<u>D&O Claims</u>").

  The Court adjourned the status conference to June 25, 2015, to permit the Committee, the Debtors, and Insiders additional time to attempt a global settlement of their disputes.  The Court

---

[1] The relevant section of the transcript from the May 5 Status Conference is enclosed.
AFDOCS/12211254.2

555 West Fifth Street, 48th Floor
Los Angeles, CA 90013-1065
**T** 213.629.7400 **F** 213.629.7401

1675 Broadway
New York, NY 10019-5820
**T** 212.484.3900 **F** 212.484.3990

55 Second Street, 21st Floor
San Francisco, CA 94105-3470
**T** 415.757.5500 **F** 415.757.5501

1717 K Street, NW
Washington, DC 20006-5344
**T** 202.857.6000 **F** 202.857.6395

Court
June 22, 2015
Page 2

**Arent Fox**

asked undersigned counsel for the Committee to provide the Court with a status report by June 22, 2015.[2]

**Background**

On February 3, 2015, this Court issued a Memorandum Decision and Order granting in part the motion to dismiss and leave to amend the complaint. The Court maintained the existing discovery schedule such that all fact discovery had to be completed by May 8, 2015. The Court's decision precipitated settlement successful negotiations between the Committee and Leucadia National Corporation, *et al.* ("Leucadia").

On February 19, 2015, the Committee and Leucadia reached an agreement in principal to settle all claims between the parties in the above-referenced adversary proceeding (the "Leucadia Action") in exchange for a lump sum payment of $8 million to the Debtors' estates. The Committee agreed to the settlement for the reasons set forth in the 9019 Motion.

On March 20, 2015, the Committee and the Debtors filed the 9019 Motion for approval of the settlement. Attached as an exhibit to the 9019 Motion was a copy of the settlement agreement that was negotiated and executed by the parties to the Leucadia Action (the "Settlement Agreement").

On April 28, 2015, Marcatel Com, S.A. de C.V., Gusma Properties, LP, Gusma Investment, LP, Progress International, LLC, Unifica Contact Media S.A. de C.V., Gustavo M. de la Garza Ortega ("Don Gustavo"), Gustavo M. de la Garza Flores, and Roberto Margain (collectively, the "Insiders") filed the Insiders' 9019 Objection, asking the Court to deny approval of the Settlement Agreement. The Insiders' principal argument for denial of the 9019 Motion is that the Settlement Agreement contains objectionable releases that might interfere with the subrogation rights of the insurers of the Insiders. The releases contained in the Settlement Agreement were required by Leucadia – even though any such claims had previously been waived and released by the Insiders on November 23, 2011. (*See* Status Letter dated June 19, 2015 [Adv. Pro. ECF No. 36]).

In advance of the hearing on the 9019 Motion, the parties to the Settlement Agreement filed their replies in support of the 9019 Motion. On May 1, 2015, Leucadia filed a reply, which

---

[2] The Court also suggested that an expedient approach to settlement negotiations would be a face-to-face meeting between the Insiders and their counsel, the Committee's counsel, a Committee professional or a businessperson from the Debtor, and representatives from all relevant insurance carriers. Such a meeting has not taken place – mainly because counsel for the excess carrier has only recently acknowledged the timeliness of the claim and joined in discussions. The Committee remains supportive of such a meeting and potentially mediation; however, this should not delay scheduling of the final hearing on the 9019 Motion.
AFDOCS/12211254.2

Court
June 22, 2015
Page 3

# Arent Fox

set forth, *inter alia*, why the releases are necessary, appropriate and supported by law.  On May 4, 2015, the Committee and the Debtors filed their reply and disputed the Insiders' contentions.

On May 5, 2015, the Court held a status conference to discuss the Insiders' 9019 Objection during which the parties agreed to search for a global settlement.

In the weeks following the May 5 Status Conference, the parties were unable to reach a global settlement.  Therefore, on June 9, 2015, the Court conducted a brief telephonic conference call with counsel for the Committee, Debtors, Insiders and the primary D&O insurance carrier (the "June 9 Informal Conference").

**Current Status**

Since the June 9 Informal Conference, some limited progress has been made.  Specifically, the primary and excess D&O insurance carriers have both acknowledged that the Committee's claims under applicable D&O insurance policies were made timely, before the expiration of the claims-reporting period on June 18, 2015.  First, this acknowledgement obviated the need to file the D&O Action last week.  Second, the D&O carriers' acknowledgement created a path for the Committee and the Insiders to reach another extension of the tolling agreement.

On June 19, 2015, the Insiders and the Committee entered into a third tolling agreement which ends on July 9, 2015.  Under that tolling agreement, the Committee has until Monday, July 13 to file adversary proceedings concerning the D&O Claims and the Chapter 5 Claims.

The Committee will continue to exercise its best efforts to settle the D&O Claims and the Chapter 5 Claims, with the participation of all interested parties, including the primary and excess D&O insurance carriers.  The tolling agreement enables the parties to continue working towards a resolution of the D&O Claims and Chapter 5 Claims without resort to commencing new actions until at least July 13.  With respect to the Leucadia settlement however, Leucadia, the Debtors and the Committee believe that there should be no further delay in scheduling a final hearing on the 9019 Motion.

The parties are scheduled to appear for another status conference before the Court on June 25, 2015 at 11:00 a.m.  At that time, the Committee will request that the Court schedule a final hearing on approval of the 9019 Motion ("9019 Final Hearing").  We have consulted with Debtors' counsel, the Committee's witnesses, counsel for Leucadia and counsel for the Insiders[3] about available dates for the 9019 Final Hearing.  To facilitate scheduling, subject to the Court's

---

[3] Counsel for the Insiders is available on July 15 but requests that the Court conduct a status conference on that date and not a final evidentiary hearing.

AFDOCS/12211254.2

Court
June 22, 2015
Page 4

**Arent Fox**

availability, the Committee respectfully requests that the 9019 Final Hearing be scheduled on any of the following dates:  July 15, 21, 28, or 31.

At this time, the Committee anticipates presenting three witnesses in support of the 9019 Motion:  B. Lee Fletcher, William K. Lenhart, and Eric Roman.  Their Declarations in support of the 9019 Motion will be offered as their declarations on direct.

In order to move forward in a timely way, and to the extent discovery is required by the Insiders and permitted by the Court, all discovery should be mutual and completed by July 10, 2015.  The Insiders' 9019 Objection was filed without any evidentiary support and therefore the Committee also will require that the Insiders make a witness available for cross-examination at the 9019 Final Hearing.

The Committee remains committed to continuing settlement discussions.  The scheduling of the 9019 Final Hearing is consistent with and will promote that objective.

Respectfully submitted,

George P. Angelich

cc:    Thomas R. Califano, Esq.
       Frederick E. Schmidt, Jr., Esq.
       Rocco A. Cavaliere, Esq.

Enclosure:  Excerpt of Transcript of May 5, 2015 Status Conference

AFDOCS/12211254.2

**In Re:**

*VIVARO CORPORATION, et al.*

*12-13810-mg & Adversary Proceedings*

---

*May 5, 2015*

---

*eScribers, LLC*

*(973) 406-2250*

*operations@escribers.net*

*www.escribers.net*

*To purchase copies of this transcript, please contact us.*

Min-U-Script® with Word Index

**VIVARO CORPORATION, et al.**

60

1          MR. SCHMIDT:  Tricom USA, Inc., yeah.  We've seen

2    reports that Tricom USA, Inc. simply ceased to exist.  So we

3    don't think there's really anybody there to go after.

4          We haven't dismissed the case yet because if somehow

5    something rolls out of the sky, we'd like to be able to take

6    advantage of it.  But at this point, we don't see much of

7    anything there.

8          THE COURT:  Okay.  Thanks.  Anything else to report on

9    or not?

10          MR. SCHMIDT:  I think that does it, Your Honor.  Thank

11    you.

12          THE COURT:  Okay.  So let's move to the Leucadia

13    National adversary proceeding.  It's adversary proceeding 14-

14    02213.  It was on the calendar for a 9019 motion.  There was an

15    objection to the 9019 that was filed on behalf of a group of

16    parties.  I think my chambers -- Mr. Angelich reported that

17    we'd move forward today as a status conference, not an

18    evidentiary hearing, so tell me where --

19          MR. ANGELICH:  Sure.

20          THE COURT:  Make your appearance, and then let's talk

21    about it.

22          MR. ANGELICH:  Thank you, Your Honor.  George Angelich

23    of Arent Fox, counsel to the official committee of unsecured

24    creditors of Vivaro, also the plaintiff in the Leucadia action.

25          Your Honor, if I can actually just take one step back

**VIVARO CORPORATION, et al.**

61

1    to talk about the 2004?

2            THE COURT:  Sure.

3            MR. ANGELICH:  We filed a 2004 in the main case to

4    take certain discovery of former officers of the company.

5            THE COURT:  These are the people who are objecting?

6            MR. ANGELICH:  Well, not exactly.

7            THE COURT:  Okay.

8            MR. ANGELICH:  The former general counsel on a few

9    other key officers who, right now, are not targets of the

10   action.  We withdrew that 2004 yesterday by letter we've lodged

11   on the Court's docket.

12           THE COURT:  I did know that.  Okay.

13           MR. ANGELICH:  Just to make Your Honor aware, we've

14   received cooperation voluntarily from all three of those

15   witnesses and they've been very helpful.  And they've agreed to

16   continue to cooperate, so we have no reason to seek an order or

17   a subpoena at this point.

18           THE COURT:  Okay.

19           MR. ANGELICH:  Some of those individuals we had

20   already spoken to --

21           THE COURT:  And I was advised that that was withdrawn

22   and dismissed.

23           MR. ANGELICH:  Yes.  And just so Your Honor is aware,

24   we had spoken to at least one of those individuals previously

25   and they had indicated willingness to continue to cooperate,

**VIVARO CORPORATION, et al.**

62

1   but for various reasons it wasn't until we filed the motion

2   that we got everyone's attention again.

3          But moving on to the 9019 and the adversary

4   proceeding --

5          THE COURT:  Okay, just so we're clear -- so I gave the

6   adversary proceeding number.  It's 14-02213.  The motion that's

7   pending is the joint motion of the official committee of

8   unsecured creditors and the debtors for an order approving

9   settlement agreement between the represented defendants under

10  Rule 9019.  The motion is filed as ECF docket number 709, and

11  in adversary proceeding 14-02213, it's ECF docket number 23.

12         MR. ANGELICH:  Thank you, Your Honor.  Last week we

13  were all a little caught off guard by the objection that we

14  received from the objecting parties.  But --

15         THE COURT:  So who's here for the objecting parties?

16         MR. CAVALIERE:  Rocco Cavaliere of Tarter Krinsky.

17         THE COURT:  Okay, Mr. Cavaliere.

18         MR. ANGELICH:  But we appreciate they have certain

19  issues and concerns with the settlement.  That being said,

20  Leucadia's settlement really sort of paves or cuts a path

21  towards a possible plan of liquidation.  And if it were

22  approved, it would provide eight million dollars to the estate,

23  which would close almost completely the administrative

24  insolvency gap that we currently have.

25         THE COURT:  That's what they're worried about because

**VIVARO CORPORATION, et al.**

63

1  they're next in line for your threatened claims against them.

2         MR. ANGELICH:  Yes, Your Honor.  And we've had some

3  productive discussions since the fall concerning some of the

4  insider claims, the preference claims.  We even had meeting

5  with the defendants.  I won't get into any 408 conversations.

6         THE COURT:  Right.

7         MR. ANGELICH:  And please stop me if I'm even heading

8  in that direction.  But we've had discussions directly with the

9  Ds and Os, and one of the two insurance carriers.  And we had,

10  we thought, some productive conversations on April 21st.  We

11  gave them a one-hour presentation about the claims we thought

12  we might be bringing in and then without a single mention at

13  that meeting or after that meeting, we got this, which was

14  quite a shock.

15         But we do believe that this still offers a material

16  step forward towards a liquidating plan.  The sole objection,

17  as Your Honor has noted, is from a group of insiders who, as

18  you know --

19         THE COURT:  May I ask this?

20         MR. ANGELICH:  Uh-huh.

21         THE COURT:  Is it D&O insurance or --

22         MR. ANGELICH:  No, with --

23         THE COURT:  -- a fiduciary policy?  What's the

24  insurance that you're looking toward?

25         MR. ANGELICH:  Sure.  There is -- so this action, the

**VIVARO CORPORATION, et al.**

64

1  Leucadia action, does not involve any D&O.

2          THE COURT:  I know.  But I guess I'm talking about Mr.

3  Cavaliere's clients.

4          MR. ANGELICH:  Right.

5          THE COURT:  Is there insurance?  What kind of

6  coverage?

7          MR. ANGELICH:  Yes, Your Honor, there --

8          THE COURT:  What are policy amounts?  That's all

9  discoverable information, so I'm not asking anything --

10          MR. ANGELICH:  Understood, Your Honor.

11          THE COURT:  -- I'm sure hasn't been explored.

12          MR. ANGELICH:  There are two policies.  There's a five

13  million dollar policy and then a five million dollar excess

14  policy.

15          THE COURT:  It's D&O?

16          MR. ANGELICH:  Yes.  Yes, Your Honor.  And the acts

17  that we have identified, we believe, fall within the definition

18  of wrongful acts for coverage.  So the answer to Your Honor's

19  question is yes, there is a policy in place.

20          THE COURT:  Who represents the D&O carrier?

21          MR. ANGELICH:  Arnold & Peabody (sic).

22          THE COURT:  Who provided the primary and who the

23  excess?

24          MR. ANGELICH:  Hiscox is the primary.  The excess is

25  Torus.  That's sort of their street names.  They go by other

**VIVARO CORPORATION, et al.**

65

1  identifications, State National Insurance.

2         THE COURT:  And they do have counsel?

3         MR. ANGELICH:  They do.  Arnold & Peabody (sic)

4  represents the primary.  We haven't yet sat down with the

5  excess attorneys.

6         THE COURT:  Okay.

7         MR. ANGELICH:  So --

8         THE COURT:  How do you want to move forward?  I mean,

9  so I have this proposed settlement in front of me.  Mr.

10  Cavaliere, you won't find it a complete surprise that the Court

11  always views with some suspicion or skepticism when the

12  objections to a settlement are the likely next group of targets

13  for litigation if the claim is settled.  That isn't to say -- I

14  want to be clear, that isn't to say you don't have a valid

15  objection, but it's not the first time I've seen it.  And it

16  does at least raise some skepticism on my part.  But I'll give

17  you a chance to address.

18         Go ahead, Mr. Angelich.

19         MR. ANGELICH:  Your Honor, what we agreed to late last

20  week was that we would try to put process in place to address

21  some of the insiders' concerns with the group of claims that

22  we're about to bring next.

23         And if somehow we're able to pull this all together

24  and come back to you, Your Honor, with a big bow on the

25  preference claims and the D&O claims, and if we're able to

**VIVARO CORPORATION, et al.**

66

1  accomplish that in a short period of time, then I think it

2  makes a lot of sense to just sort of push this out thirty days

3  or so and let's see where we're able to get to.

4        And hopefully by then, we can report back to you that

5  we either have a nice global settlement and everything's been

6  resolved, or we actually need to have oral argument on some of

7  these issues.

8        THE COURT:  Tell me -- so Mr. Cavaliere's argued that

9  the Court would be required to have an evidentiary hearing on

10  approval of the 9019.  I suspect you think you don't need it,

11  but let's assume that the Court believes I need to have an

12  evidentiary hearing.  What evidence is it that you -- not the

13  specifics of the proof, but what witnesses would you expect to

14  call?  How would you proceed with an evidentiary hearing to

15  establish that your proposed settlement with Leucadia is fair,

16  reasonable, and in the best interests of the estate?

17        MR. ANGELICH:  So there's -- let me address one issue

18  first and get it out of the way, and that is we submitted a

19  declaration and a reply about a former attorney-client

20  relationship my firm had twelve years ago with Leucadia.

21  That's been flagged as an issue.

22        THE COURT:  And it was -- and I'm not making any

23  rulings at all.  I wasn't particularly impressed, Mr.

24  Cavaliere, about your raising an issue whether Arent Fox has a

25  conflict because -- how many years ago?

**VIVARO CORPORATION, et al.**

67

1          MR. ANGELICH:  Twelve years.

2          THE COURT:  Twelve years ago they represented

3    Leucadia.  I mean, it is not a particularly appealing argument.

4    Let's put it that way.

5          MR. CAVALIERE:  I just --

6          THE COURT:  Are you continued (sic) to press that?

7          MR. CAVALIERE:  At the time that we filed the

8    objection, all of the details associated with when that

9    relationship ended were not privy to me, Your Honor.  So that's

10   part of the reason why we raised it and looking for some

11   information with regard --

12         THE COURT:  Okay.  Are you -- with respect to that

13   issue, are you now satisfied?

14         MR. CAVALIERE:  With respect to that issue, we are

15   satisfied, Your Honor.

16         THE COURT:  Okay, all right.

17         MR. CAVALIERE:  Although we do think creditors have a

18   right to have seen it and made their own decision and

19   determination.  It could have been highlighted in a footnote.

20   But I'm not going to press forward on that particular issue.

21         THE COURT:  Okay, so we put that issue to rest, Mr.

22   Angelich.

23         MR. ANGELICH:  Thank you, Your Honor.  So --

24         THE COURT:  What other evidence would you anticipate?

25   You're not going to -- and I have heard -- you don't need to

**VIVARO CORPORATION, et al.**

68

1  deal with the alleged conflict from a twelve-year-prior

2  representation.

3          MR. ANGELICH:  With that issue out of the way, Your

4  Honor, we would present three witnesses in support of the 9019

5  motion.
          The first would be reflected in the affidavit that we

6  filed last Friday of Eric Roman, who is with me at counsel

7  table, who was involved in the prosecution of those claims and

8  negotiation of those claims, and was very closely involved in

9  analyzing the defenses of Leucadia.

10         And we formed a good-faith basis to conclude that we

11 had a reason to settle in the range we settled.

12         THE COURT:  After I dismissed a good part of your

13 claims.

14         MR. ANGELICH:  Yes, Your Honor.

15         THE COURT:  I think I wrote an opinion that dealt with

16 it.  I understand --

17         MR. ANGELICH:  We --

18         THE COURT:  -- why you might have -- I'm not saying

19 it's the right decision, but you certainly -- on some claims I

20 dismissed without leave to amend and some with leave to amend,

21 and some survived.

22         MR. ANGELICH:  Yes, Your Honor.  And we took your

23 opinion to heart, and we analyzed it carefully.  And we

24 understood there were ways to address Your Honor's issues and

25 concerns.  And we were prepared to go forward, but within a

**VIVARO CORPORATION, et al.**

69

1   week of receiving Your Honor's opinion, we were approached

2   about a global settlement.

3              THE COURT:  Okay.

4              MR. ANGELICH:  So Mr. Roman would be -- his affidavit

5   would be put into evidence.  The next affidavit that we would

6   put into evidence, and if we had to call as a witness --

7              THE COURT:  Yeah, and you hit it on the nose.  The way

8   I would ordinarily proceed is the direct testimony by affidavit

9   with the declarant available for cross-examination in court

10  would be the -- unless the objectors present me with compelling

11  arguments why the direct shouldn't be by affidavit, that would

12  ordinarily be the way in which I would proceed.  Obviously,

13  they'd have to be here for cross-examination.

14             MR. ANGELICH:  And they would be, Your Honor.  And the

15  next would be Bill Lenhart.  Mr. Lenhart was a managing

16  director and led the insolvency practice at BDO, is now a

17  private consultant and still affiliated with BDO, and is still

18  an advisor to the creditors' committee.

19             He would testify as to some of the business analysis

20  that the committee engaged in to evaluate the merits of

21  settling, the process that we undertook to evaluate the

22  different alternatives going forward versus settling and

23  accepting the deal as it was negotiated and ultimately

24  presented to us as the final offer.

25             THE COURT:  Okay.

**VIVARO CORPORATION, et al.**

70

1      MR. ANGELICH:  And then the final affidavit, the

2   third, would be the affidavit of B. Lee Fletcher, who is the

3   acting chief financial officer of the debtors, who has signed

4   an affidavit, Your Honor, stating that this settlement closes

5   the gap on administrative insolvency, and in some scenarios

6   puts his wealth through priority claims and potentially pays

7   off all priority claims.  So the --

8      THE COURT:  So tell me -- let's assume the settlement

9   is approved, what potential claims -- because a lot of them

10  haven't been filed yet -- what claims do you believe remain?

11  So I know --

12     MR. ANGELICH:  Yes.

13     THE COURT:  -- there's these potential insider claims.

14  Other than the potential insider claims, are there other claims

15  that --

16     MR. ANGELICH:  So we have this --

17     THE COURT:  What's this --

18     MR. ANGELICH:  -- sort of preference program that's

19  going on, Your Honor, and then we have claims against the

20  insiders for preference and potentially fraudulent conveyance.

21  And then we have the D&O action that we have the ten million

22  dollars in coverage.

23     So those are the three buckets of potential claims.

24     THE COURT:  All right.  Let me hear from Mr.

25  Cavaliere.  Are you -- Mr. Schmidt, do you want to be heard

**VIVARO CORPORATION, et al.**

71

1    first and then I'll --

2            MR. SCHMIDT:  Yeah, I just wanted to let the --

3            THE COURT:  We'll get everybody on one side first.

4            MR. SCHMIDT:  I just wanted to let the Court know that

5    there was one other bucket that was pre-petition.  There was a

6    spinoff -- a sale of one of the businesses.  Your Honor may

7    recall the Unidos note that we had speaking about during the

8    case.  There was a payment that was due on that note.  There

9    has been --

10            THE COURT:  There's a real collectability issue,

11    though, isn't there?

12            MR. SCHMIDT:  Well, we think there actually is a

13    collectable -- we think that they're good for it.  They have

14    raised issues regarding pre-petition alleged lack of disclosure

15    of liabilities as an escape hatch, and we've been discussing

16    with them.  We've had our businesspeople speak with the --

17            THE COURT:  How much is the note?

18            MR. SCHMIDT:  A million, two-five.  So it's not

19    nothing, Your Honor.  It was a part of the -- or the recoveries

20    thereof were a part of the sale of the business, fifty percent

21    of the net proceeds.

22            But so far, unfortunately, we've had to expend some

23    legal expenses, so I'm not sure what that's going to be for

24    them.

25            THE COURT:  Okay, thanks.  Mr. Cavaliere?

**VIVARO CORPORATION, et al.**

72

1      MR. CAVALIERE:  Good afternoon, Your Honor.  Your

2  Honor, I think since the filing of --

3      THE COURT:  Just make your full appearance again since

4  the first time you've given it.

5      MR. CAVALIERE:  Oh, sure.  Rocco Cavaliere, Tarter

6  Krinsky & Drogin on behalf of the various objecting parties.

7      Your Honor, we filed the objection last Tuesday

8  because we believe, as holders of the largest claims in the

9  case, as well as parties that are directors in this case, have

10  rights and we have a right to be heard.  I understand --

11      THE COURT:  I'm hearing you.

12      MR. CAVALIERE:  -- Your Honor's skepticism in that

13  regard with regards to insiders.  And in that regard --

14      THE COURT:  You're not surprised at that, I assume.

15      MR. CAVALIERE:  No, I'm not, Your Honor.  But we

16  are -- we do have thirteen million dollars in unsecured claims,

17  which, by my estimation, is fifteen to twenty percent of the

18  unsecured creditor pool here, a substantial interest in this

19  case, and we would argue the largest victims in this case.

20      And with regards to the preference claims, people hear

21  about preference claims --

22      THE COURT:  I always get skeptical when people say the

23  insiders are the largest victims in a case.  But --

24      MR. CAVALIERE:  Well, there are many victims.  It's an

25  unfortunate circumstance.

**VIVARO CORPORATION, et al.**

73

1          THE COURT:  I think they may have been asleep at the

2     switch, but --

3          MR. CAVALIERE:  Well that -- there are no facts to

4     support that; part of the problem here that we're having with

5     committee counsel.  There are various allegations that are all

6     constantly raised with regards to Mr. de la Garza, but no -- if

7     you ask them for proof, backup support, draft complaint,

8     nothing is forthcoming because --

9          THE COURT:  Be careful what you ask for, because you

10     may get it.

11          MR. CAVALIERE:  I'm happy to receive it.

12          THE COURT:  It won't be a draft.  It'll be filed.

13          MR. CAVALIERE:  Well, it may very well be and that --

14     unfortunately, if that was to take place, I think that would

15     be -- create more issues in the case than -- and that's why I

16     think that it's productive that the parties have engaged in

17     some good-faith discussions through Mr. Schmidt's mediation

18     skills, if you will.

19          And I think while we certainly haven't reached a

20     resolution of the preference claims, I think we do have --

21     we've gotten in the right -- taken it to the right position

22     where I think that we have a framework for possibly reaching a

23     deal.

24          And then ultimately, with regards to the alleged

25     directors and officers claims -- because they are covered by

**VIVARO CORPORATION, et al.**

74

1    insurance -- we've had some preliminary discussions with the

2    insurance carrier.  We're happy to have committee call the

3    insurance carrier directly as well, and I understand that that

4    will -- and we'll participate as much as possible.  But those

5    discussions --

6        THE COURT:  Rather than a call, what I have found in

7    the past is that if you and Mr. Angelich will -- and Mr.

8    Schmidt -- arrange a face-to-face meeting in which you can get

9    representatives of the insurers present as well -- face-to-face

10   meeting with your clients, the committee counsel, and a

11   businessperson from the committee, frankly, or from the debtor,

12   and actually get yourself in a room together, lock yourself in

13   a room and try and hash this through so you -- because

14   otherwise what I have found is you'll have a conversation with

15   Mr. Angelich or Mr. Schmidt.  And you'll have questions.

16   They'll have questions.  And then you'll go back and you'll

17   talk to the insurers' counsel, and they'll have some more

18   questions.  And the process will go on for a very long time,

19   and none of this will get resolved, and that the fastest way to

20   try and move it along is to get everybody in a room, committed

21   to have a serious discussion about trying to resolve the

22   matters, understanding what reasonable requests for information

23   each side may have and the insurers before -- insurers don't

24   like to write checks.  What information they have, and try and

25   move it along.

**VIVARO CORPORATION, et al.**

75

1          Otherwise, you're going to have this series of one-off

2    conversations and you'll be back here in three or six months

3    and the ball will have not advanced very far.

4          Preference claims, it's different because insurance

5    isn't going to cover those.

6          MR. CAVALIERE:  Understood.  And with regards to the

7    meeting, I think that's a fabulous idea.  There was an initial

8    meeting on April 21st, as Mr. Angelich alluded to, where the

9    insurance carrier did attend with my client --

10          THE COURT:  Okay.

11          MR. CAVALIERE:  -- and a couple of colleagues of mine.

12    They did a presentation.  Unfortunately, it didn't advance the

13    ball enough to result in a settlement, but when I asked for a

14    draft complaint and Your Honor alluded to the fact be careful

15    what you ask for, that -- in our view, that is a step towards

16    convincing the insurance carriers the seriousness of the

17    allegations to the extent that --

18          THE COURT:  Okay.

19          MR. CAVALIERE:  -- and we would provide a draft

20    answer.  This is actually protocol that we'd discussed but it

21    hasn't been followed.  And we think that it could be productive

22    to actually force the settlement, because otherwise it's just

23    people speaking about various allegations, as opposed to

24    actually demonstrating some proof.

25          With regards to the preference claims, one of the

**VIVARO CORPORATION, et al.**

76

1    frustrations on our end, we have drafted three substantive

2    letters and an e-mail with some analysis over the course of the

3    last few months, and we haven't received one response, one

4    actual detailed response citing to any particular reasons why

5    our analysis is not correct.

6        We believe we have meritorious defenses, subsequent in

7    value, in ordinary course.  There's a collection issue.  There

8    is a savings of costs issue, the fact that we have thirteen

9    million dollars --

10        THE COURT:  What's the collection issue?

11        MR. CAVALIERE:  Well, Your Honor, my client is located

12    in Mexico and frankly, we believe we have strong defenses.  We

13    don't believe that, ultimately -- that Your Honor will find

14    that they're liable in any way.

15        But to the extent that you do, we -- the Committee is

16    going to have to chase them down for some money.  And I don't

17    believe that -- well, we'll get that far, but there has --

18    these are all aspects of reasons why people settle cases.  And

19    I'm not getting that yet, although I will say this, there was

20    much movement through Mr. Schmidt's efforts late last week, and

21    I hope that the continued discussions take the same path

22    towards a conclusion on that issue.

23        So, Your Honor, I just -- I do want to note something

24    also on the Rule 2004 motion that was withdrawn.  We filed an

25    objection to it.  The committee was looking for testimony from

**VIVARO CORPORATION, et al.**

1  former officers that are not slated to be targets, and that's

2  fine.  We're not looking to add more targets.  I represent the

3  directors and so forth.

4          But one of the former -- one of the parties that is

5  subject of that Rule 2004 that has been withdrawn, which was

6  voluntarily decided to provide information, is -- the one whose

7  name is Roberta Kraus, she is former general counsel of the

8  debtors.  And we raised some significant concerns about her

9  testimony with regards to attorney-client privileged

10 communications that she may have had with the company, which my

11 clients are directors and shareholder, may have, when

12 consulting with her on legal advice, may have had the

13 impression that she was providing advice.

14         THE COURT:  Who holds the privilege?

15         MR. CAVALIERE:  I -- that's a great question.  The

16 debtors hold the privilege, although one could argue maybe the

17 directors do.

18         THE COURT:  You think so?  Do you have any authority

19 for that?  Who holds the privilege?

20         MR. CAVALIERE:  Not right now.  The debtors.

21         THE COURT:  I think you have a problem.

22         MR. CAVALIERE:  It could be argued that the debtors

23 are my clients.  My clients are on the board of the debtors.

24         THE COURT:  Oh, I don't think so, but that's --

25         MR. CAVALIERE:  Okay, but I'm just concerned

**VIVARO CORPORATION, et al.**

78

1 about -- if there are going to be interviews, I'd like an

2 opportunity to sit in.  If there are going to be documents

3 exchanged --

4   THE COURT:  Oh, you're not going to sit in.  You

5 can -- the committee or the debtor or both and their counsel

6 can conduct interviews without you there.  If it gets to

7 litigation and a deposition is noticed, obviously you'd have a

8 right to be there.  But you're not going to -- you're certainly

9 not going to get any order from me entitling you to be present

10 when the committee or the debtors or both interview prospective

11 witnesses in their effort to develop information.

12   But here's what we're going to do for now:  Vivaro is

13 on the calendar on June 25th at 10 a.m.  I'm going to adjourn

14 the conference in the Leucadia matter until June 25th at 11

15 a.m.  I don't know whether we can finish with the first part of

16 the calendar by 11, but we'll set it at 11.

17   I would ask, Mr. Angelich, that you file a written

18 status report on or before Monday, June 22nd at 5 o'clock with

19 respect to the matter.

20   What I anticipate will happen is that will be -- the

21 25th will be a status conference again.  If necessary, at that

22 time, I'll schedule a hearing -- an evidentiary hearing,

23 approval of the settlement.

24   Mr. Cavaliere, how many witnesses would you expect to

25 call?  And again, I would expect that you would put in

**VIVARO CORPORATION, et al.**

1    declarations in advance and declarants would be present for

2    cross-examination in court, and we'd proceed with -- Mr.

3    Angelich has told me who the three people he's going to call.

4    Do you know, at this point, who you would call in opposition?

5            MR. CAVALIERE:  I don't know just yet, Your Honor.  I

6    do believe that I will take the cross-examination of the three

7    individuals.

8            THE COURT:  I'm sure you will, but --

9            MR. CAVALIERE:  I've already reviewed their

10   declarations --

11           THE COURT:  -- because I need to know --

12           MR. CAVALIERE:  -- and have a number of questions.

13           THE COURT:  Certainly by the 25th you have to be

14   prepared to identify on the record who the witnesses you intend

15   to call, not just give me a laundry list that you may or may

16   not call.  By the 25th, if this isn't resolved and I have to

17   schedule an evidentiary hearing, I want to know exactly who it

18   is you intend to call as witnesses at a hearing on approval of

19   the settlement.  And if necessary, on that June 25th date, I'll

20   set an evidentiary hearing.  In all likelihood, it would just

21   be a couple of weeks later.  I mean, we're not -- this is not

22   going to get dragged out.

23           MR. CAVALIERE:  Understood, Your Honor.

24           THE COURT:  Okay.

25           MR. CAVALIERE:  What I may do to advance the ball --

**VIVARO CORPORATION, et al.**

80

1          THE COURT:  Sure.

2          MR. CAVALIERE:  -- on my end to determine which

3   potential witnesses I may want to call, I may -- again, I don't

4   want to rub anyone the wrong way with regards to the current

5   posture where we are.  I think everyone wants to work together

6   towards a settlement of all issues, but perhaps on a parallel

7   track, I may serve some subpoenas for some documents relevant

8   to this motion that --

9          THE COURT:  On what basis do you think you can serve

10  subpoenas for production of documents?

11         MR. CAVALIERE:  Well, Your Honor, it's a contested

12  matter and I think that the --

13         THE COURT:  What's a con --

14         MR. CAVALIERE:  It's a motion that was objected to.

15  We have a right to -- just for documents with regard to -- that

16  may be in the possession of the committee and that may have --

17         THE COURT:  Well, a 9014 -- in a contested matter, on

18  9014, I control -- there's an issue of to what extent do the

19  rules for adversary proceedings apply.  I'm not making any

20  determination about it now.

21         MR. CAVALIERE:  Okay.

22         THE COURT:  In the first instance, you'll try and work

23  those issues out with Mr. Angelich, okay?

24         MR. CAVALIERE:  Okay, understood.  I'll do my best to

25  just informally ask specific questions of documents they may

**VIVARO CORPORATION, et al.**

1   have in their possession.

2          THE COURT:  All right, that's fair enough.

3          MR. CAVALIERE:  And then I can come back to the Court,

4   if necessary.

5          THE COURT:  So we're shooting for that hearing on the

6   25th.  I asked Mr. Angelich to file that status letter by the

7   22nd.  If you feel that you need to separately file a status

8   letter, you can do it the same date and time.  You could also

9   confer with Mr. Angelich and file a single letter that

10  addresses both of your concerns.  Okay?

11         MR. CAVALIERE:  Okay.  He's not talking to me right

12  now, Your Honor, so --

13         THE COURT:  He's not?

14         MR. CAVALIERE:  -- we assume he will be.

15         THE COURT:  No?

16         Briefly.

17         MR. ANGELICH:  Very briefly.  I could respond to just

18  about --

19         THE COURT:  But you won't.

20         MR. ANGELICH:  -- everything he said.

21         THE COURT:  I understand, but you're not going to.

22         MR. ANGELICH:  But I won't.  But I will say this, Your

23  Honor, we're going to get a bunch of document requests and

24  information requests, and we are going to assert privilege to

25  the extent that there is any information that's being requested

**VIVARO CORPORATION, et al.**

82

1    that was provided or exchanged between the committee and its

2    counsel.  I really hope we don't waste the Court's time

3    fighting over that type of stuff.

4            THE COURT:  I hope you don't as well.  If you have a

5    discovery dispute, you know my procedures.  You meet and confer

6    in an effort to resolve it.  If you can't, the party needing

7    the assistance of the Court calls and arranges a prompt

8    hearing.  I generally hold those hearings within a day or two

9    of the request.  And it's rare that I ever need briefing on it

10   and it's usually only letter briefs when I do.

11           I would say in the last eight and a half years, I've

12   only asked for letter briefs three or four times total, and the

13   rest of them I've resolved the issues just by listening to

14   counsel argue their positions.

15           Sometimes where the issue is privilege, I have asked

16   for some letter briefs, but even on that, I think I have a

17   pretty good sense of what the law and privilege is.  Okay?

18           MR. ANGELICH:  Thank you, Your Honor.

19           THE COURT:  Thanks.

20           MR. CAVALIERE:  Thank you, Your Honor.

21           THE COURT:  Somebody else wanted to be heard.  Come on

22   up.

23           MR. SOUTH:  Your Honor, George South of DLA Piper on

24   behalf of Leucadia and Baldwin defendants.  I just wanted to

25   let the Court know that I'm present in the Court if there's

**VIVARO CORPORATION, et al.**

83

1  anything --

2        THE COURT:  Wanted to get the settlement approved.

3        MR. SOUTH:  That would be great, Your Honor.  But we

4  understand there might be some delay and we're okay with that.

5  But --

6        THE COURT:  We're going to move it along.  I'm sure

7  your client wants to pay its eight million dollars and --

8        MR. SOUTH:  It's a Catch-22.

9        THE COURT:  It's burning a hole in its pocket.

10        MR. SOUTH:  Right.

11        THE COURT:  It wants to pay it very promptly.

12        MR. SOUTH:  I assume the Court doesn't have any

13  questions for me, but I wanted to give you an opportunity in

14  case you did.

15        THE COURT:  Well, you would certainly -- I mean, at a

16  hearing on approval, you're a party-in-interest on that for

17  sure.

18        MR. SOUTH:  Yes.  I don't expect that we'd have a fact

19  witness --

20        THE COURT:  Okay, that's fine.

21        MR. SOUTH:  -- if we were to --

22        THE COURT:  But you're going to let me know -- you're

23  going to let everybody know by that date for the status

24  reports, which I said was the 22nd of June, if you're intending

25  to call any witnesses, please identify them then so

**VIVARO CORPORATION, et al.**

84

1  everybody -- when we come in on the 25th, everybody knows

2  what's happening.  Okay?

3         MR. SOUTH:  Yes, Your Honor.

4         THE COURT:  Thanks very much.  All right.

5         Anybody else want to be heard?

6         Mr. Schmidt?

7         MR. SCHMIDT:  Yes, Your Honor.  I just want to make it

8  clear on the record because I heard something about a mediation

9  in this case.  I wanted to make it clear that I am not acting

10 as a mediator per se.

11        THE COURT:  You know --

12        MR. SCHMIDT:  I am on the panel, but I am clearly

13 interested.  I'm not disinterested.  I'm a partisan in this.

14 I'm just trying to facilitate a deal if I can.

15        THE COURT:  I understood that, okay?

16        MR. SCHMIDT:  I thought Your Honor did.  I just wanted

17 to make sure it was on the record.

18        THE COURT:  If they all trust you, keep trying.  Okay?

19        MR. SCHMIDT:  Just to be --

20        THE COURT:  They all recognize that you're not the

21 mediator in the case.  But that doesn't mean that you can't try

22 and bring the parties together to get it resolved.  Okay?

23        MR. ANGELICH:  And we really appreciate Mr. Schmidt's

24 efforts, especially late last week when this was looking like

25 it was going to come off the rails entirely.

**VIVARO CORPORATION, et al.**

85

1        But one of the things that we've mentioned in our

2   reply, it sort of mirrors one of the objecting parties' points,

3   and that is maybe we need to have a really good effort at good-

4   faith settlement here, and we're going to really talk to each

5   other.  And maybe that really needs to have a mediator

6   involved.  So I think if Mr. Cavaliere is agreeable to that,

7   we're prepared to identify one now.

8        THE COURT:  I think -- I'm a big supporter of

9   mediation.  I don't have a -- I think it ought to be

10  consensual.  There are a lot of good mediators around.  There's

11  good counsel on all sides.  Nothing stops you from talking to

12  each other and if you think that mediation -- talk to Mr.

13  Cavaliere.  If you believe that a mediation will help, I

14  suspect that you will be able to agree on someone who could

15  knock heads and help get it done.  Okay?

16       MR. ANGELICH:  Thank you, Your Honor.

17       THE COURT:  All right.  Put that -- look, and if you

18  do decide to mediate, give me a status letter right away on

19  that issue.  Okay?  I'm not adjourning any of the hearings I've

20  set, but I do want it -- so if you do mediate, move it along, I

21  would consider at some point, if you're making progress in

22  mediation, pushing the dates a little bit.  Okay?

23       (Whereupon these proceedings were concluded at 3:29 PM)

24

25